UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
LUMINENT MORTGAGE CAPITAL, INC.;      :
MINERVA MORTGAGE FINANCE              :
CORPORATION; and MERCURY MORTGAGE     :
FINANCE STATUTORY TRUST,              :
                                      :
                                      :  Civ. A. No.
              Plaintiffs,             :  ECF CASE
                                      :
        v.                            :
                                      :
                                      :
                                      :
HSBC SECURITIES (USA) INC.,           :
                                      :
              Defendant.              :
                                      :
------------------------------------------------------------ x

**JUDGE CASTEL**

## COMPLAINT

Plaintiffs LUMINENT MORTGAGE CAPITAL, INC. ("Luminent"), MINERVA MORTGAGE FINANCE CORPORATION ("Minerva"), and MERCURY MORTGAGE FINANCE STATUTORY TRUST ("Mercury," and collectively with Luminent and Minerva, "Plaintiffs"), by and through their undersigned attorneys, as and for their Complaint against Defendant HSBC SECURITIES (USA) INC. ("HSBC" or "Defendant"), hereby allege as follows:

### PARTIES

1.   Plaintiff Luminent is a Maryland corporation having its principal place of business at 101 California Street in San Francisco, California 94111.

2.   Plaintiff Minerva is a Maryland corporation that is an indirect subsidiary of Luminent having its principal place of business at 101 California Street in San Francisco, California 94111.

3.  Plaintiff Mercury is a Maryland Business Trust that is a subsidiary of Luminent having its principal place of business at 101 California Street in San Francisco, California 94111.

4.  Upon information and belief, Defendant is a Delaware corporation having its principal place of business at 452 Fifth Avenue, New York, New York 10018.

## JURISDICTION AND VENUE

5.  There is complete diversity of citizenship between the parties, and the amount in controversy is in excess of $75,000, exclusive of interest and costs. Therefore, the Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332.

6.  Venue is proper pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## NATURE OF THE ACTION

7.  This action for damages arises out of Defendant's egregious attempt to exploit a recent seizing-up of the credit markets and wrongfully confiscate certain bonds Minerva and Mercury had effectively posted with it as collateral. Defendant attempted to accomplish its misappropriation by willfully breaching, without justification, repurchase agreements that required it to sell those securities, if at all, only in a commercially reasonable manner, and to otherwise act in good faith.

8.  More specifically, Defendant accomplished its confiscation by falsely discounting and misrepresenting the true value of the bonds to begin with, conducting a farcical, wholly inadequate bidding process that did not remotely approach the applicable standard of commercial reasonableness, and then using its knowing devaluation of the bonds and bidding charade as a pretext to opportunistically and improperly misappropriate the securities.

## **COMMON ALLEGATIONS**

9. Luminent is a Maryland Corporation incorporated as a real estate investment trust that is headquartered in San Francisco, California, and has operations in Philadelphia, Pennsylvania. Luminent is the indirect parent of Minerva and the parent of Mercury, and from time to time it guarantees certain of Minerva's and Mercury's obligations.

10. Minerva is a Maryland Corporation and qualified real estate investment trust subsidiary that, as part of its business, purchases and sells securities. In connection with such transactions, Minerva sometimes enters into so-called "repurchase agreements."

11. Mercury is a Maryland Business Trust and qualified real estate investment trust subsidiary that, as part of its business, purchases and sells securities. In connection with such transactions, Mercury sometimes enters into so-called "repurchase agreements."

12. Upon information and belief, HSBC is an NASD Regulated Broker/Dealer engaged in the business of, *inter alia*, buying and selling securities. In connection with such activity, HSBC often enters into repurchase agreements.

13. Repurchase agreements are a common financing tool that permit a buyer of a security to obtain temporary financing for the purchase price by effectively borrowing funds from a counter-party (such as HSBC) who receives, in exchange for a loan, a security interest in the security to be purchased. More specifically, in exchange for the counterparty providing the borrower/purchaser with loan proceeds that it uses to complete its purchase, the borrower/purchaser typically transfers the purchased security to the counterparty. After an agreed-to period of time, the borrower/purchaser then repurchases the security from the counterparty. The repurchase price typically consists of the principal amount the buyer originally received plus interest that has accrued at an agreed-to rate.

### A.    Minerva's and Mercury's Respective Repurchase Agreements With HSBC.

14.    On or about December 19, 2005, Minerva and Mercury each entered into its own "Master Repurchase Agreement" with HSBC, each agreement being supplemented by certain annexes attached thereto (each a "Repurchase Agreement" and, collectively, the "Agreements").

15.    Luminent acted as a guarantor of Minerva's and Mercury's respective obligations under the Agreements.

16.    Under section 1 of the Agreements, Minerva or Mercury (as the case may be) could execute repurchase transactions with HSBC from time to time, wherein Minerva or Mercury (as applicable) would transfer to HSBC securities in exchange for a payment, "with a simultaneous agreement by [HSBC] to transfer to [Minerva or Mercury (as applicable)] such securities at a date certain or on demand, against the transfer of funds by [Minerva or Mercury (as applicable)]." The security "transferred" to HSBC would, in effect, serve as collateral for the funds transferred to Minerva or Mercury (as applicable) until the date such entity repurchased from HSBC the previously "transferred" security.

17.    Section 4 of the Agreements provided that in the event the market value of any security so transferred to HSBC diminished beyond a certain agreed-to level, HSBC could issue a "margin call" and thereby require Minerva or Mercury (as the case may be) to post additional collateral or cash.

18.    The Agreements endowed HSBC with much control over the securities "transferred" to it with respect to the determination of their value and their disposition in the event of an unsatisfied margin call. However, in determining the value of securities "transferred" or other collateral posted, HSBC was required to act in a commercially reasonable manner and in good faith at all times.

19. Section 11 of the Agreements provided that, should Minerva or Mercury (as the case may be) fail to meet a margin call, HSBC could declare an "Event of Default" and then attempt to liquidate the collateral (and credit Minerva or Mercury (as applicable) in the amount of proceeds received). In such case, HSBC would be required to act in a commercially reasonable manner and in good faith at all times.

**B.    The July and August 2007 Repurchase Transactions and the Subsequent Market Downturn.**

20. In accordance with its Repurchase Agreement with HSBC, on July 27, 2007 Minerva executed a repurchase trade with HSBC relating to a "net interest margin" bond issued by HASCO NIM (CAYMAN) COMPANY 2007-NC1 and bearing CUSIP number "418098AA7" (the "NIM Bond"). The repurchase transaction had a 30-day term such that Minerva would repurchase the NIM Bond on August 27, 2007 for the principal amount borrowed, plus accrued interest at a rate of 5.57% per annum.

21. At the time of the trade, the NIM Bond had a current face amount of $14,065,818.87, was rated "A-" by Standard & Poor's and Fitch Ratings, and according to its offering memorandum, had a principal payment window of only ten months. In other words, there could be no reasonable doubt that the NIM Bond would pay 100% of any interest and principal payments owed by its issuer.

22. In accordance with its Repurchase Agreement with HSBC, on the morning of August 3, 2007, Mercury executed eight repurchase transactions with HSBC relating to eight additional bonds valued at an aggregate of $24,842,750 (collectively with the NIM Bond, the "Bonds").

23. Later that day, the bond market seized-up against the backdrop of a perceived crisis concerning the so-called "sub-prime" mortgage loan market.

24.     HSBC then issued margin calls with respect to the Bonds – purportedly to cover a shortfall in the value of the Bonds posted with it as collateral – ultimately demanding an unreasonable total of approximately $5.74 million in margin payments from Plaintiffs.

25.     Aware that the Bonds were much more valuable than HSBC was representing them to be, Plaintiffs refused to simply submit to HSBC's unreasonable margin demands.

**C.     HSBC's Wrongful Confiscation of the Posted Collateral and Phony Bidding Process.**

26.     On August 27, 2007, HSBC telephoned Luminent and represented that it had already held – weeks earlier – an auction with respect to the nine Bonds. Defendant went ahead with its so-called "auction" despite its knowledge that Plaintiffs strongly disagreed with, *inter alia*, HSBC's unreasonably low valuation of the Bonds. Indeed, the notion of attempting to liquidate the collateral at such time made no sense in view of what HSBC already knew – that the Bonds were not in danger of defaulting, that HSBC's marking them down in value was unreasonable, and that selling them in an aberrational, temporarily seized market was therefore unnecessary and the height of foolhardiness.

27.     That same day, HSBC e-mailed Luminent a spreadsheet that purported to show the results of an auction held with respect to the Bonds and indicated that HSBC, conveniently, had submitted the highest bid for all of the Bonds.

28.     But, in fact, HSBC did not conduct a valid bidding process. The spreadsheet HSBC e-mailed indicated that *only one* third-party had bid for the NIM Bond – by far the largest of the Bonds from Plaintiffs being held by HSBC; that *only two* third-parties had bid for five of the other Bonds; and that only three of the Bonds purportedly received a bid from three third-parties. In fact, HSBC's putative bidding process was remarkably limited as it failed to, *inter*

*alia*, seek bids from typical commercial holders such as insurance companies, investment managers, retirement funds, collateralized debt obligation ("CDO") managers, and hedge funds.

29. HSBC's spreadsheet also represented, incredibly, that the single third-party bidder for the NIM Bond had bid merely $60.13, despite the fact that it was still rated "A-" and had a principal payment window of only nine months; the only other supposed "bidder" for this bond – HSBC – purportedly "bid" only $70. Yet, over two months later, that bond was still rated "A-" and continues to stand little, if any, chance of not paying 100% of the principal and interest owed by the issuer. Moreover, HSBC's putative "winning bids" for certain of the Bonds were for little more than half of the Bonds' true market value.

30. In fact, as HSBC was well aware, the Bonds actually had a market value much higher than that at which HSBC was trying to confiscate them. Indeed, HSBC was simply exploiting an aberrational market as a pretext to unreasonably mark down the purported value of the Bonds, demand an unreasonable amount of additional collateral from Plaintiffs, and then unilaterally confiscate the Bonds for itself at an artificially steep discount.

31. Sticking by its story that it was the highest "bidder" for all of the Bonds, on or about September 20, 2007 HSBC wrongfully claimed ownership over them, stating during a telephone call with Plaintiffs that it had taken them into the company's inventory.

32. On October 2, 2007 Plaintiffs informed HSBC (by e-mail) that it would repurchase all of the posted Bonds on the next day for the principal amount owed plus accrued interest through October 2. HSBC responded by saying it no longer considered the Bonds to be "a repo position," that it had supposedly held an auction and "took down the securities."

33. In fact, HSBC's representations regarding its so-called auction were false. HSBC was fully aware that the Bonds actually had a market value much higher than that at which it was

7

trying to confiscate them. It was simply exploiting an aberrational market as a pretext to unreasonably mark down the purported value of the Bonds, demand an unreasonable amount of additional collateral from Plaintiffs, and then unilaterally confiscate them for itself at an artificially steep discount.

## FIRST CAUSE OF ACTION
### Breach of Contract

34. Plaintiffs restate and reallege the allegations set forth in Paragraphs 1 through 33 as if set forth fully herein.

35. Each Repurchase Agreement is a valid, binding and enforceable contract, supported by good and valuable consideration, that required Defendant to act in a commercially reasonable manner with respect to the valuation and any liquidation of collateral Plaintiffs posted with it.

36. Defendant breached these contracts by, *inter alia*, (1) improperly valuating the Bonds at artificially low prices; (2) wrongfully triggering margin calls; (3) feigning a failed bidding process in order to confiscate the Bonds for its own account at artificially low prices; and/or (4) rushing to liquidate the Bonds during an unusually depressed, aberrational market, rather than waiting a reasonable time before attempting to sell the collateral, if at all.

37. As a result of the foregoing breaches, Plaintiffs have suffered and will continue to suffer damages.

## SECOND CAUSE OF ACTION
### Breach of Covenant of Good Faith and Fair Dealing

38. Plaintiffs restate and reallege the allegations set forth in Paragraphs 1 through 37 as if set forth fully herein.

39. Each Repurchase Agreement required Defendant to act in all instances in good faith in accordance with the implied covenant of good faith and fair dealing.

40. Defendant breached each contract's implied covenant of good faith by, *inter alia*, (1) improperly valuating the Bonds at artificially low prices; (2) wrongfully triggering margin calls; (3) feigning a failed bidding process in order to confiscate the Bonds for its own account at artificially low prices; and/or (4) rushing to liquidate the Bonds during an unusually depressed, aberrational market, rather than waiting a reasonable time before attempting to sell the collateral, if at all.

41. As a result of the foregoing breaches, Plaintiffs have suffered and will continue to suffer damages.

### THIRD CAUSE OF ACTION
### Conversion

42. Plaintiffs restate and reallege the allegations set forth in Paragraphs 1 through 41 as if set forth fully herein.

43. Under the Repurchase Agreements, Minerva and Mercury provided HSBC with possession of the Bonds solely for the purpose of serving as collateral and subject to their right to retake possession in exchange for the principal amount borrowed from HSBC, plus accrued interest.

44. Plaintiffs have repeatedly demanded possession of the Bonds in exchange for the principal and interest owed, as is their right.

45. HSBC has intentionally, repeatedly interfered with Plaintiffs' right to possess the Bonds by refusing to deliver possession of them, and in fact has wrongfully claimed ownership of them.

46. As a direct and proximate result of Defendant's wrongful interference with Plaintiff's right to possess the Bonds, Plaintiffs have suffered and will continue to suffer damages.

47. By reason of the forgoing acts of confiscating the Bonds for itself rather than returning possession of them to their rightful owners, Minerva and Mercury, Defendant is liable for conversion.

## FOURTH CAUSE OF ACTION
### Unjust Enrichment

48. Plaintiffs restate and reallege the allegations set forth in Paragraphs 1 through 47 as if set forth fully herein.

49. Minerva and Mercury "transferred" the Bonds to HSBC solely for the purpose of serving as collateral and subject to their right to retake possession in exchange for the principal amount borrowed from HSBC, plus accrued interest.

50. Instead of properly valuating the Bonds to begin with, or returning them to Plaintiffs in exchange for the principal amount borrowed plus accrued interest after failing to properly valuate them, Defendant made unreasonable margin demands and then held a purported "auction" in which it, conveniently, had submitted the highest bid for all of the Bonds and then "took down the securities" into the company's inventory.

51. In fact, as HSBC was well aware, the Bonds actually had a market value much higher than that reflected by HSBC's putative "winning bids." Indeed, HSBC was simply trying to confiscate the Bonds for itself at an artificially steep discount by exploiting an aberrational market with its unreasonable margin demands and phony bidding process.

52. By reason of the forgoing acts of confiscating the Bonds for itself, HSBC has been unjustly enriched at Plaintiffs' expense by wrongfully taking for itself Bonds that Plaintiffs

were entitled to retake possession of and that were worth much more than the amounts HSBC claims to have paid for them (and then credited Plaintiffs) as part of its so-called "auction."

53.    As a direct and proximate result of Defendant's unjust enrichment, Plaintiffs have suffered and will continue to suffer damages.

## RELIEF SOUGHT

WHEREFORE, Plaintiffs demand relief as follows:

(i) Compensatory damages in an amount to be proved at trial;

(ii) Punitive damages;

(iii) Attorney's fees and costs of suit; and

(iv) Such other and further relief as the Court may deem just and appropriate.

Dated:    New York, New York
October 18, 2007

_____
Sean F. O'Shea (SO5476)
Michael E. Petrella (MP3794)
**O'SHEA PARTNERS LLP**
90 Park Avenue, 20th Floor
New York, New York 10016
Tel:    (212) 682-4426
Fax:    (212) 682-4437